**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
***Norfolk Division***

**UNITED STATES OF AMERICA**

**Plaintiff,**

**v.**

**Docket No. 2:19cr65**
**The Hon. Robert Doumar**
**UNDER SEAL**

**ERNEST WALKER,**

**Respondent.**

**MEMORANDUM IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)**

The Defendant, Ernest Walker ("Mr. Walker"), through counsel, respectfully moves this Court to grant his motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A), and order the remainder of his sentence to be served on home confinement, or, in the alternative, issue a non-binding recommendation that the BOP transfer Mr. Walker to home confinement for the duration of Mr. Walker's sentence, pursuant to 18 U.S.C. § 3624(c), the CARES Act, and Attorney General Barr's April 3, 2020 and April 22, 2020 Memoranda. This motion should be granted because the global COVID-19 pandemic, combined with Mr. Walker's age and serious underlying medical conditions, presents an "extraordinary and compelling reason" for compassionate release.

Mr. Walker is particularly susceptible to COVID-19 and is more likely to suffer dire consequences from the virus due to his advanced age and his complex medical history. Mr. Walker is 62 years old and currently suffers from multiple underlying health conditions which make him more vulnerable than the average person, including (1) being immunocompromised from poorly managed HIV, (2) high blood pressure, (3) high cholesterol, and (4) diabetes.[1] Additionally, Mr. Walker's

[1] *See* PSR ¶ 86; *see also* Ex. 1, Mr. Walker's BOP medical records, filed under seal.

incarceration at FDC Philadelphia, (where three staff have tested positive for the virus)[2] exposes Mr. Walker to a particularized risk of contracting the disease because the virus thrives in densely packed populations. FDC Philadelphia is ill-equipped to contain the pandemic and prevent COVID-19 from spreading to inmates like Mr. Walker. Allowing Mr. Walker to finish out the remaining years of his sentence in New Jersey with his family is the only prudent and just response to the extraordinary and compelling circumstances created by the novel coronavirus.

Mr. Walker is not a danger to the community, and his release plan adheres to the mandates of Section 3553(a), particularly in light of the cataclysmic events of the pandemic. We respectfully ask the Court to consider this motion on an expedited basis as the risk to Mr. Walker's life multiplies exponentially with each passing day.

## FACTUAL BACKGROUND

On December 19, 2019, Mr. Walker was convicted of one count of Possession with Intent to Distribute Heroin in violation of 21 U.S.C. 841(a)(1) and (b)(1)(B) and 18 U.S.C. 2, and two counts of Distribution of Heroin in violation of 21 U.S.C. 841(a)(1) and (b)(1)(C). ECF No. 35. He was sentenced to 141 months followed by five years of supervised release. *Id.* His current release date is January 29, 2029.[3]

Mr. Walker advises that on March 31, 2020, he requested that the warden at FDC Philadelphia move for compassionate release on the same grounds as submitted herein. He further advises he received a response on Saturday, May 20, 2020, denying his request. Mr. Walker says he is in the process of filing for an appeal.

Mr. Walker is currently being held at FDC Philadelphia, which is a federal holding facility. The US Marshals confirmed to undersigned counsel on March 24, 2020, that Mr. Walker has been

---

[2] *See* Fed. Bur. of Prisons, COVID-19 Tested Positive Cases, available at https://www. bop.gov/coronavirus/ (last visited May 19, 2020).

[3] *See* Fed. Bur. of Prisons, Inmate Locator, available at https://www.bop.gov/inmateloc/ (last visited May 27, 2020).

designated to Hazelton FCI. However, because of the COVID-19 pandemic, Mr. Walker has not yet been moved. It is unknown when Mr. Walker will be moved to Hazelton FCI.

## SUMMARY OF ARGUMENT

***First***, the Court should exercise its authority to grant Mr. Walker's Motion for Compassionate Release without requiring full exhaustion. *See* 18 U.S.C. § 3582(c)(1)(A). By enacting the First Step Act of 2018, Congress amended § 3582 to eliminate the BOP as the sole gatekeeper of compassionate release after BOP's documented failure to "properly manage the compassionate release program."[4] Now, a defendant can seek relief directly from a sentencing court as early as 30 days after submitting a request to a warden asking for the BOP to file such a motion, or after completing an administrative appeal process, whichever occurs first. Mr. Walker's request to the warden was made more than 30 days ago, and his request was denied.

***Second,*** this Court should exercise its authority to grant Mr. Walker compassionate release because the COVID-19 pandemic combined with Mr. Walker's unique susceptibility to COVID-19, given his age and complicated medical history, is an "extraordinary and compelling" reason warranting relief. As long as Mr. Walker remains incarcerated, Mr. Walker faces an unacceptable risk of contracting and dying from COVID-19. As of May 25, 2020, BOP reported that 4,759 inmates and 589 BOP staff members have tested positive for COVID-19; 59 federal inmates have died as a result.[5] These figures under-estimate COVID-19's real toll "given the paltry number of tests the federal government has made available" at some BOP facilities,[6] and because BOP only announced on April

---

[4] Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program*, at 11 (April 2013); *see also* Department of Justice, Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, at 51 (May 2015) ("Although the BOP has revised its compassionate release policy to expand consideration for early release to aging inmates, which could help mitigate the effects of a growing aging inmate population, few aging inmates have been released under it.").

[5] Fed. Bur. of Prisons, COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/ (includes recovered cases).

[6] *See, e.g., Wilson v. Williams*, No. 4:20-cv-00794, 2020 WL 1940882, at *2 (N.D. Ohio Apr. 22, 2020) (FCI Elkton received only 50 tests); *see also Louisiana federal prison no longer testing symptomatic inmates for coronavirus due to 'sustained transmission'*, The

23, 2020, that it would begin to test asymptomatic inmates, and has only done so at select facilities.[7] According to BOP Director Michael Carvajal, "more than 30% of our federal prisons are currently affected," including 51 BOP facilities and 30 Residential Re-Entry Centers, and "institutions such as Oakdale, Elkton, Danbury, Lompoc, Butner, Yazoo City, Forrest City, and Milan are 'hotspots' for COVID-19."[8]

The alarming spread of COVID-19 in BOP facilities confirms that, despite its efforts, BOP cannot safeguard prisoners. For example, from April 21 through April 29, 2020 – more than three weeks after BOP implemented Phase 5 of its COVID-19 Action Plan and inmate quarantine – Terminal Island FCI reported a 1,000% percent increase of new positive cases (from 57 inmates to 570 inmates).[9] This is not an outlier: during the same period, Fort Worth FMC positive inmate cases increased from 35 to 298, and at Butner Medium I cases increased from 27 to 212.[10] Courts have criticized BOP's overall response as "insufficient" given "the number of infections and deaths which have already occurred in federal custodial institutions,"[11] and one court described BOP efforts at FCI Elkton as fighting "a losing battle. A losing battle for staff. A losing battle for inmates." *Wilson v. Williams*, No. 4:20-cv-00794, 2020 WL 1940882, at *1 (N.D. Ohio Apr. 22, 2020).

---

Lens (Mar. 31, 2020), available at https://thelensnola.org/2020/03/31/louisiana-federal-prison-no-longer-testing-symptomatic-inmates-for-coronavirus-due-to-sustained-transmission/

[7] *Federal prison system expands virus testing to find hidden asymptomatic infections*, USA Today (Apr. 23, 2020), https://www.usatoday.com/story/news/politics/2020/04/23/coronavirus-federal-prisons-expand-testing-asymptomatic-inmates/3015287001/; *BOP Expands COVID-19 Testing: Rapid Testing Available at Select Facilities*, Fed. Bureau Prisons (Apr. 24, 2020), https://www.bop.gov/resources/news/20200424_expanded_testing.jsp

[8] BOP Direct Michael Carvajal's Message to Prison Staff (Apr. 10, 2020), Transcript available at https://prisonology.com/wp-content/uploads/2020/04/COVID-19-Video-transcript-of-BOP-Director-Michael-Carvajal.pdf

[9] Fed. Bur. of Prisons, COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/.

[10] The Marshall Project, *Tracking the Spread of Coronavirus in Prisons* (Apr. 24, 2020), available at https://www.themarshallproject.org/2020/04/24/tracking-the-spread-of-coronavirus-in-prisons ("The number of new cases among prisoners is more than doubling each week . . ..").

[11] *United States v. Joling*, No. 6:11-cr-60131-AA, 2020 WL 1903280, at *5 (D. Or. Apr. 17, 2020).

Even in the best circumstances, inmates cannot provide self-care because their incarceration prevents them from following CDC guidance: "People in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for cleaning and laundry, avoid frequently touched surfaces, or sanitize their own environment." *United States v. Skelos*, 15-CR-317 (KMW), 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020). There are serious doubts that BOP will be able to adequately care for prisoners as the COVID-19 pandemic continues to unfold.[12] For these reasons, federal courts nationwide have held that COVID-19 constitutes an extraordinary and compelling basis for ordering compassionate release for defendants facing a rapidly growing mortal threat from exposure to the coronavirus in federal prisons.[13] In light of the specific threat Mr. Walker faces, this Court should do the same.

***Third***, the Section 3553(a) factors warrant Mr. Walker's release. Mr. Walker is not a danger to the community. He is 62 years-old. His health is deteriorating. Mr. Walker's serious medical conditions can be managed more effectively on supervision. Mr. Walker also can take advantage of programming in the community—something he has been unable to do to date because he has been stuck in transit.[14] Finally, Mr. Walker has a solid release plan. Once released, he would be living with his 22-year-old daughter and his children's mother Sharice Wesley, in Brick, New Jersey.

## ARGUMENT

### I. The Court Has Jurisdiction To Grant Mr. Walker Compassionate Release Without Delay.

By enacting the landmark First Step Act of 2018, Congress amended 18 U.S.C. § 3582(c)(1)(A)(i) to allow, for the first time, defendants to move on their own behalf for a reduction

[12] The Inspector General has found widespread medical staffing shortages across BOP facilities that "lower staff morale, increase staff workload, and ultimately can reduce inmates' access to routine medical care." *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, Office of the Inspector General (March 2016), available at https://oig.justice.gov/reports/2016/e1602.pdf.

[13] *See* Ex. 2: Courts Granting Compassionate Release in Light of COVID-19.

[14] *See* Ex. 3, BOP programming statement for Mr. Walker.

of sentence. A defendant may file such a motion when he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, ***whichever is earlier*[.]**" First Step Act of 2018, § 603(b), Pub. L. 115- 391, 132 Stat. 5194, 5239 (Dec. 21, 2018) (emphasis added). Congress selected this exceptionally short 30-day waiting period in order to expedite defendants' access to the courts and the courts' consideration of compassionate release motions. *See, e.g., United States v. Haney*, 19-cr-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020).

Here, the 30-day waiting period has passed, and Mr. Walker's request has been denied. While he has not yet exhausted the entire appeals process, the United States has previously taken the position that what Mr. Walker has done meets the exhaustion requirement.[15]

---

[5] Although we use the term "exhaustion requirement," to be clear, an inmate need not "exhaust" administrative remedies if the motion is filed in court 30 days after receipt of a request by the warden. If the BOP rejects the request or takes no action within the 30 day window, the inmate is then free to press his position in the appropriate federal court.

While Mr. Walker does not concede that the Court must wait 30 days in every case, since Mr. Walker has done so here, it is his position that the exhaustion requirements have been met.

## II. The COVID-19 Pandemic Presents an Extraordinary and Compelling Reason for Mr. Walker's Compassionate Release Due to Mr. Walker's Particular Vulnerability.

### A. This Court can determine that COVID-19 presents an extraordinary and compelling reason for compassionate release.

Under Section 3582(c)(1)(A)(i), this Court "may reduce the term of imprisonment" if it finds that "extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]" The Sentencing Commission has issued a policy statement that provides factual considerations for determining

---

[15] *See United States v. Herbert Smith*, 2:18cr96, ECF No. 37, fn. 5.

whether compassionate release is appropriate. Those considerations include three enumerated categories of "reasons" – relating to defendant's medical condition, age, and family circumstances – as well as a "catchall" provision: any "other reasons" as determined by the BOP. U.S.S.G. § 1B1.13, Application Note 1(A).[16] However, this policy statement is outdated[17] and inconsistent with the First Step Act to the extent it provides that only the BOP may determine what "other reasons" qualify as "extraordinary and compelling."[18]

It is the Courts' role to determine what "other reasons" warrant compassionate release, notwithstanding the Commission's outdated policy statement that provided for BOP to make that determination. *See United States v. Maumau,* 2:08-cr-758-TC, 2020 WL 806121, at *7-8 (D. Utah Feb. 18, 2020). Numerous courts have recognized the judicial authority to find that compassionate release is warranted for "other reasons" than those set forth in U.S.S.G. § 1B1.13. *See, e.g., United States v. Poulios,* No. 2:09-cr-00109-RAJ-TEM, 2020 WL 1922775, at *2 (E.D. Va. Apr. 21, 2020) ("[T]he court may consider a combination of factors including but not limited to those listed in Application Note 1 in evaluating a petitioner's request for a sentence modification under the 'catch-all' provision."); *United States v. Redd,* Case No. 1:97-cr-00006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020) ("[T]he

[16] Additionally, the commentary makes clear that the extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." U.S.S.G. § 1B1.13, Application Note 2. In other words, even if an "extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court, [that fact] does not preclude consideration for a [sentence] reduction." *Id.*

[17] Since the passage of the First Step Act, there have not been enough commissioners to update the Commission's policies or amend the Sentencing Guidelines. *See United States v. Brown,* No. 4:05-CR-00227-1, 2019 WL 4942051 at *2 n.1 (S.D. Iowa Oct. 8, 2019) ("As district courts have noted often this year, the Sentencing Commission has not amended the Guidelines following the First Step Act and cannot do so until it again has four voting commissioners.").

[18] *See United States v. Perdigao,* No. 07-103, 2020 WL 1672322, at *2 (E.D. La. Apr. 2, 2020) ("Many courts have concluded that . . . the Sentencing Commission does not have a policy position applicable to motions for compassionate release filed by defendants pursuant to the First Step Act."; *United States v. Rodriguez,* No. 2:03-cr-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020) (""the scope of the old policy statement is clearly outdated and, at the very least, does not apply to the entire field of post-First Step Act motions . . . . Therefore, the policy statement may provide 'helpful guidance' but does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i).""); *United States v. Cantu-Rivera,* No. H-89-204, 2019 WL 2578272, at *2 n.1 (S.D. Tex. June 24, 2019) ("Because the current version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provisions must be given effect." (internal citation omitted).

Court joins other courts in concluding that a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C)").

There is ample precedent to support compassionate release in light of prisoners' particular susceptibility and vulnerability to COVID-19. Courts in the Fourth Circuit and across the country have found that a defendant's heightened risk and particular vulnerability to COVID-19 in prison constitutes an "extraordinary and compelling reason" in favor of compassionate release.[19]

Alternatively, this Court has also recognized that the "gross disparity" between the sentence that the defendant received and the sentence that he would have received after passage of the First Step Act presented an "extraordinary and compelling reason" for compassionate release. *Redd*, 2020 WL 1248493. Although the Court's decision in *Redd* did not address the coronavirus (it was not at issue), it speaks to the issue presented here: if Mr. Walker is not released, he faces a potential death sentence, which is not what Congress or the Court intended at sentencing. *See, e.g., Edwards*, 2020 WL 1650406, at *6 ("Had the Court known when it sentenced Defendant in 2018 that the final 18 months of his term in federal prison would expose him to a heightened and substantial risk presented by the COVID-19 pandemic on account of Defendant's compromised immune system, the Court would not

[19] *See, e.g., United States v. Poulios*, No. 2:09-cr-00109-RAJ-TEM, 2020 WL 1922775, at *3 (E.D. Va. Apr. 21, 2020) (finding "extraordinary and compelling reasons to modify [defendant's] sentence because of the great risk that COVID-19 poses to a person of [defendant's] age with underlying health conditions"); *Dinning v. United States*, No. 2:12-cr-84, 2020 WL 1889361, at *2 (E.D. Va. Apr. 16, 2020) ("[T]he confluence of petitioner's medical conditions and the COVID-19 pandemic may constitute an extraordinary and compelling reason for sentence modification . . . ."); *United States v. Jones*, No. 3:11-cr-249 (E.D. Va. Apr. 3, 2020) (granting compassionate release and converting remainder of sentence to home confinement in light of "the current public health crisis caused by COVID-19"); *United States v. Edwards*, No. 6:17-cr-3-NKM, 2020 WL 1650406, at *6 (W.D. Va. Apr. 2, 2020) (granting compassionate release); *United States v. Collins*, No. CCB-10-336, 2020 WL 1506176 (D. Md. Mar. 30, 2020) (granting compassionate release to a "non-violent drug offender who has already served a lengthy sentence" even though "it has not been proffered that [defendant] has an underlying health condition which makes him more susceptible to the effects of the virus, and while the risks posed by a defendant's continued residence in a detention facility do not necessarily mandate release"); *United States v. Copeland*, Case No. 2:05-CR-135-DCN (D.S.C. Mar. 24, 2020) (granting compassionate release in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments defendant has during this current pandemic").

have sentenced him to the latter 18 months."). The Court may grant compassionate release to avoid such a gross disparity.

B. Mr. Walker is particularly susceptible to contracting COVID-19 because of his conditions of confinement.

Since January 2020, COVID-19 has spread widely – and rapidly – throughout the United States. Positive cases have been confirmed in all 50 states and the District of Columbia.[20] Since March 21, 2020, the total number of confirmed cases in the United States has skyrocketed from 15,219 to 1,637,456 as of May 25; the number of deaths has risen from 201 to 97,669. *Id.* As of May 25, 2020, the Bureau of Prisons reported that 4,759 inmates and 589 staff members have tested positive for COVID-19.[21] Mr. Walker is currently housed at a facility where three members of its staff have tested positive.[22]

These numbers are growing every day, and almost certainly understate the problem, as the United States in general, and prisons in particular, are vastly behind where they need to be in testing for this virus. Given the rapid onset of symptoms and the fact that many carriers are asymptomatic, the unfortunate reality is that once there is a positive case, it may be too late to prevent further spread in a prison.

The nation's prison system is particularly ill-equipped to handle the spread of a disease as contagious and deadly as COVID-19. COVID-19 can enter a facility and spread rapidly, *entirely undetected.* Indeed, the Director of the CDC recently warned that up to 25 percent of people infected with COVID-19 "may not show symptoms."[23] The virus has already spread rapidly in BOP and state

[20] *See* CDC, *COVID-19 Cases in the US*, available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[21] *See* Fed. Bur. of Prisons, COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/ (includes recovered cases).

[22] *Id.*

[23] Apoorva Mandavilli, "Infected but Feeling Fine: The Unwitting Coronavirus Spreaders," *New York Times* (March 31, 2020) available at https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html (last visited Apr. 24, 2020). *See also* CDC, "How Coronavirus Spreads" webpage ("Some recent studies have suggested that

facilities.[24] Due to the crowded and confined nature of a detention facility, the spread of the virus in the prisons and jails is far outpacing its spread in the community.

Conditions of confinement create the ideal environment for the transmission of contagious disease.[25] In fact, the top two hotspots of COVID-19 in the United States are both prisons: Marion Correctional Institution reported that 81% of its population (2,011 inmates) have tested positive, and Pickaway Correctional Institution reported 77% (1,536 inmates) have tested positive.[26] "Prisons are petri dishes for contagious respiratory illnesses."[27] Inmates cycle in and out of jails and prisons, and people who work in the facilities leave and return daily. According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[28] Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[29] The conditions of confinement not only affect incarcerated individuals, but also the community at large. "With 2.3

---

COVID-19 may be spread by people who are not showing symptoms."), available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Apr. 24, 2020)

[24] *See* Timothy Williams, Benjamin Weiser and William K. Rashbaum, "'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars," *New York Times* (Mar. 30, 2020), *available at* https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html (last visited April 1, 2020) ("Hundreds of Covid-19 diagnoses have been confirmed at local, state and federal correctional facilities — almost certainly an undercount, given a lack of testing and the virus's rapid spread — leading to hunger strikes in immigrant detention centers and demands for more protection from prison employee unions").

[25] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, at https://doi.org/10.1086/521910.

[26] Catherine Candisky, "Coronavirus surges at Pickaway prison, now No. 2 hot spot in nation – behind Marion prison," *The Columbia Dispatch* (Apr. 23, 2020), available at https://www.dispatch.com/news/20200422/coronavirus-surges-at-pickaway-prison-now-no-2-hot-spot-in-nation---behind-marion-prison.

[27] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

[28] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

[29] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) at https://bit.ly/2TNcNZY.

million people in the United States in prison or jail on any given day, an outbreak in these facilities poses a threat to the entire country."[30] One COVID-19 model estimates that jails, as currently managed, could account for 99,000 deaths that have not be recognized by other models.[31]

Courts across the country have found that prisoners are at grave risk. "Even in the best run prisons, officials might find it difficult if not impossible to follow the CDC's guidelines for preventing the spread of the virus among inmates and staff: practicing fastidious hygiene and keeping a distance of at least six feet from others." *United States v. Esparza*, No. 1:07-cr-00294-BLW, 2020 WL 1696084 (D. Idaho. Apr. 7, 2020). Unfortunately, BOP's efforts have not protected inmates.[32]

C. Mr. Walker is more likely to suffer severe or fatal effects of COVID-19 because of his age and serious underlying health conditions.

Older individuals and people with preexisting health issues are particularly at risk of experiencing severe side effects or death as a result of this virus. According to the CDC, the following groups are at high risk for severe illness from COVID-19: (1) people aged 65 and older; (2) people who live in a nursing home or long-term care facility; (3) people with high-risk conditions, such as chronic lung disease or moderate to severe asthma, serious heart conditions, people who are

[30] *Explainer: Prisons and Jails Are Particularly Vulnerable to COVID)-19 Outbreaks*, The Justice Collaborative, available at https://thejusticecollaborative.com/wpcontent/uploads/2020/03/TJCVulnerabilityofPrisonsandJailstoCOVID19Explainer.pdf.

[31] *See COVID-19 Model Finds Nearly 100,000 More Deaths Than Current Estimates, Due to Failures to Reduce Jails*, ACLU (Apr. 22, 2020), available at https://www.aclu.org/sites/default/files/field_document/aclu_covid19-jail-report_2020-8_1.pdf.

[32] *See, e.g., United States v. Atwi*, No. 18-20607, 2020 WL 1910152, at *4 (E.D. Mich. Apr. 20, 2020) ("Positive cases among federal prisoners continue to rise, and it does not appear that preventative measures are sufficiently working yet to flatten the curve in BOP facilities."); *United States v. Razzouk*, No. 11-CR-430 (ARR), Dkt. No. 136 at 8 (E.D.N.Y. Apr. 19, 2020) (BOP's efforts at FCI Otisville "did not protect [defendant] from exposure to the disease in the first instance, despite his vulnerable status"). *United States v. Muniz*, Case No. 4:09-cr-199, 2020 WL 1540325, at *1 (S.D. Tex. Mar. 30, 2020) ("[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers . . . demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection.").

***immunocompromised***,[33] obese, or have ***diabetes*** [type 1 or 2], renal failure, or liver disease.[34] Additionally, thirty-seven percent of COVID-19 patients admitted to the ICU had another chronic disease like ***hypertension (high blood pressure)*** or ***hyperlipidemia (high cholesterol).***[35]

Mr. Walker suffers from a number of underlying health conditions which make him more susceptible to serious illness or death should he contract the virus. He is immunocompromised, and has been diagnosed with high blood pressure, high cholesterol, and diabetes. Mr. Walker is also 62 years old.

**a. Mr. Walker is immunocompromised due to poorly managed HIV.**

Mr. Walker is immunocompromised. In 1984, Mr. Walker was diagnosed with Human Immunodeficiency Virus (HIV).[36] HIV "weakens a person's immune system by destroying important cells that fight disease and infection."[37] The CDC has identified a compromised immune system as an underlying condition that increases the risk of contracting COVID-19. An "impaired immune system has a weakened ability to fight infections," making immunocompromised people "more likely to contract the novel coronavirus and die from it."[38] An immunocompromised person "may not be able to fight off a potentially deadly bacterial infection," such as pneumonia.[39] "[T]here is evidence

---

33 Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, ***poorly controlled HIV or AIDS***, and prolonged use of cortisteroids and other immune weakening medications.

34 *See* CDC, *People Who are at Higher Risk*, available at https://www.cdc.gov/coronavirus/2019-ncov/specificgroups/people-at-higher-risk.html.

35 *See CDC, MMWR: Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019* — United States, February 12–March 28, 2020, at 3, Table 1 (Mar. 31, 2020), available at https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6913e2-H.pdf.

36 *See* PSR ¶ 86.

37 https://www.cdc.gov/hiv/basics/index.html

38 Catherine Kim, Immunocompromised People Are Anxious about Being Left Behind in the Coronavirus Pandemic, Vox (Mar. 27, 2020) https://www.vox.com/identities/2020/3/27/21195024/immunocompromised-coronavirus-covid19-trump.

39 Miles, *Compromised Immune System During COVID-19 Outbreak*.

that pneumonia caused by COVID-19 may be particularly severe. . . . [C]ases of coronavirus pneumonia tend to affect all of the lungs, instead of just small parts." "In fact, . . . the cause of most deaths from influenza [is] not the flu virus itself, but a secondary bacterial infection (often pneumonia)."[40]

Mr. Walker's poorly-managed HIV makes him more at risk for becoming very sick with COVID-19. According to the CDC's website:[41]

> At the present time, we have no specific information about the risk of COVID-19 in people with HIV.
>
> Older adults and people of any age who have a serious underlying medical condition might be at higher risk for severe illness, including people who are immunocompromised. The risk for people with HIV getting very sick is greatest in:
>
> - People with a **low CD4 cell count**, and
> - People not on HIV treatment (antiretroviral therapy or ART).
>
> **People with HIV can also be at increased risk of getting very sick with COVID-19 based on their age and other medical conditions.**

Mr. Walker has been prescribed antiretroviral treatment (ART) for years to control this disease. However, his recent laboratory results show that they are not very effective.[42] This is reflected in a low CD4 count, a high viral load, and unexplained weight loss. Doctors at the BOP were concerned enough about his lab results that they switched his medications after receiving the results:

**ADMINISTRATIVE NOTE 1** **Provider:** Laughingwell, Raeph MD

CD4 is 254, and viral load is 1500 copies/mL. Discontinue Atripla and start Genvoya.

---

[40] Miles, *Compromised Immune System During COVID-19 Outbreak*.

[41] *See* CDC, *People Who are at Higher Risk*, available at https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html. (emphasis added) (last visited May 28, 2020).

[42] *See* PSR ¶ 86; *see also* Exh. 2 at 1 (reflecting low CD4 count and high viral load)

There are two basic ways to tell whether a person is winning the battle with the HIV virus: one's CD4 count (also known as T-cells) and viral load. The CD4 count signifies how the immune system is functioning because it measures how well the white blood cells are fighting off infection.[43] The higher the CD4 count, the better. A normal CD4 range is between 500-1500 cells/mm.[44] People are diagnosed with AIDS when their CD4 cell count drops below 200 cells/mm.[45] ***Mr. Walker's CD4 count is dangerously low at 254.***[46]

A person's "viral load" shows how much of the virus is in the blood.[47] When your viral load is high, you have more HIV in your body, and your immune system is not fighting HIV as well.[48] A person who is responding well to ART treatment will have undetectable amounts in their blood.[49] "The lower limit of HIV RNA [HIV viral load] detection depends on the test used--some go down to 50 copies/ml, while other go as low as 20."[50] ***Mr. Walker's viral load is also alarmingly high at 1500 copies/ML.***[51]

Additionally, Mr. Walker has lost a great deal of weight since his incarceration. In addition to a low CD4 count and high viral load, unexplained weight loss is another sign that his body is losing

---

43 See Dept. of Veterans Affairs, *CD4 count (or T-cell count)*, available at https://www.hiv.va.gov/patient/diagnosis/labs-CD4-count.asp (last visited May 28, 2020).

44 *Id.*

45 *Id.*

46 *See* Ex. 2, at. 2.

47 *See* CDC, *HIV Risk Reduction Tool*, available at https://wwwn.cdc.gov/hivrisk/increased_risk/viral_load/ (last visited May 28, 2020).

48 *See* CDC, *What are the different tests that help monitor my HIV?,* available at https://www.cdc.gov/hiv/basics/livingwithhiv/understanding-care.html. (last visited May 28, 2020).

49 *See* CDC, *Viral Load,* available at https://wwwn.cdc.gov/hivrisk/increased_risk/viral_load/ (last visited May 28, 2020)

50 See Dept. of Veterans Affairs, HIV Viral load (or 'HIV RNA'), available at https://www.hiv.va.gov/patient/diagnosis/labs-viral-load.asp (last visited May 28, 2020).

51 *See* Ex. 2, at. 2.

the fight against the HIV virus.[52] Mr. Walker weighed nearly 190 pounds at the time of his incarceration in January 2019. As noted in defense position paper, as well as in the PSR, Mr. Walker weighed 170 pounds at sentencing, reporting having lost about 20 pounds.[53]

Despite his best efforts, Mr. Walker's weight has not increased, but decreased. According to BOP records, he currently weighs just 164 pounds.

**Weight:**

| Date | Time | Lbs |
|---|---|---|
| 03/09/2020 | 10:50 PHL | 164.0 |

Mr. Walker was placed on a special diet of Ensure at the Western Tidewater Regional Jail (WTRJ) in an effort to bring his weight up. It did not work, but at least his weight remained steady. On March 9, 2020, after arriving at the BOP, Mr. Walker expressed concern about his weight loss, and requested a special diet for the same reasons.

**General**

I/M reports he was #171 when he left prior Institution(private?). Expresses concern over weight loss, requesting ensure and diabetic meal at night. I/M in on metformin 500mg bid for DM.
I/M reports he has been receiving both at prior Institution.
I/M also reports he needs his labs, especially VL & CD4 done, none x over a year.

That same day, medical staff wrote that they would review his case for Ensure:

Reviewed labs to be considered for Ensure. Reviewed current status of DM meals/snack. I/M made aware he will be seeing MO in the next couple days.

To date, Mr. Walker advises he still has not received a special diet to help combat his weight loss. He also reports not having had regular stools for weeks—another sign that his body may be losing the fight against the HIV virus.[54]

---

[52] *See* Mayo Clinic: *HIV/AIDS Overview*, available at https://www.mayoclinic.org/diseases-conditions/hiv-aids/symptoms-causes/syc-20373524.

[53] *See* PSR ¶ 86; *see also* ECF No. 30 at 2.

[54] *See* Mayo Clinic: *HIV/AIDS Overview*, available at https://www.mayoclinic.org/diseases-conditions/hiv-aids/symptoms-causes/syc-20373524.

The CDC recommends individuals with HIV should have a viral load test every 3 to 6 months, before you start taking a new HIV medicine, *and 2 to 8 weeks after starting or changing medicines.*[55] Mr. Walker's medical records reflect a change in antiretroviral medications on March 16, 2020. Yet he is not set to get blood work for another 6 months.[56]

In light of his extreme vulnerability to becoming seriously ill or dying from COVID-19, Mr. Walker is in urgent need of better medical care now. All signs point to the fact that his health is deteriorating. This is especially important in light of 18 U.S.C. § 3553(a)(D)'s mandate that the Court consider where a defendant will receive treatment in the most "effective manner." Given the life and death concerns of the COVID-19 pandemic for people who are immunocompromised like Mr. Walker, there is no question that he can get better medical care in the community.

**b. Mr. Walker's advanced age is a serious risk factor.**

Mr. Walker's advanced age, at 62 years old, also makes him more vulnerable to serious illness should he become infected. This is especially true in combination with his other medical conditions. Individuals over 60 make up just one-third of the cases in Virginia, **but nearly all of the deaths** (3223 of 9630 confirmed cases; 292 of 324 deaths).[57] More than one quarter of infected individuals aged 60-69 are hospitalized.[58]

The CDC reports that "8 out of 10 deaths [in the United States] . . . have been in adults 65 years old and older" and "31-59% of adults 65-84 years old with confirmed COVID-19 have required hospitalization."[59] This trend maintains globally and in the BOP: the regional director for WHO

[55] *See* CDC, *What are the different tests that help monitor my HIV?,* available at https://www.cdc.gov/hiv/basics/livingwithhiv/understanding-care.html. (last visited May 28, 2020). (emphasis added).

[56] *See* Ex. 1, at 1.

[57] *See* Virginia Department of Health, COVID-19 in Virginia, available at http://www.vdh.virginia.gov/coronavirus/ (last accessed April 21, 2020).

[58] *Id.* (346 hospitalizations of 1480 cases in individuals between 60-69).

[59] *See* CDC, *Coronavirus Disease 2019 (COVID-19): Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Mar. 21, 2020).

***Europe has reported that "95% of COVID-19 fatalities on the continent have been people older than 60"*** and "more than 50% of all deaths in Europe were people aged 80 or older."[60] The BOP has reported that of the 27 individuals who died from COVID-19 while in its custody at least 21 were age 50 or older.[61] Based on a study that "examined data from individuals who tested positive for COVID-19 in 38 countries[,] . . . risk of death from the disease rose with each decade of age."[62] "The chance that a COVID-19 patient would develop symptoms severe enough to require hospitalization, especially for respiratory support, also rose sharply with age."[63]

COVID-19 is caused by a new coronavirus and "[o]lder people are not as good at reacting to microorganisms they haven't encountered before."[64] "With advancing age, the body has fewer T cells, which produce virus-fighting chemicals. By puberty, the thymus is producing tenfold fewer T cells than it did in childhood" and "by age 40 or 50, there is another tenfold drop."[65] "That leaves the body depleted of T cells" that would, in a younger person, "be deployed against a never-before-seen microbe" such as the novel coronavirus.[66] This is especially troubling since Mr. Walker's CD4 (T-cell) count is already dangerously low due to his HIV.

---

60 Alex Lardieri, *WHO: Nearly All Coronavirus Deaths in Europe Are People Aged 60 and Older*, U.S. News & World Rep. (Apr. 2, 2020), https://www.usnews.com/news/world-report/articles/2020-04-02/who-nearly-all-coronavirus-deaths-in-europe-are-people-aged-60-and-older.

61 *See* Fed. Bureau of Prisons, *BOP News Stories* https://www.bop.gov/resources/news_stories.jsp (last visited Apr. 26, 2020) (publishing press releases on 26 of the 27 individuals who have died in BOP custody).

62 Erin Schumaker, Risk for Severe COVID-19 Increases with Each Decade of Age, ABC News (Apr. 1, 2020), https://abcnews.go.com/Health/risk-severe-covid-19-increases-decade-age/story?id=69914642.

63 Sharon Begley, *What Explains Covid-19's Lethality for the Elderly? Scientists Look to 'Twilight' of the Immune System*, Stat News (Mar. 30, 2020), https://www.statnews.com/2020/03/30/what-explains-coronavirus-lethality-for-elderly/ ("Begley, *What Explains Covid-19's Lethality for the Elderly?*").

64 Begley, *What Explains Covid-19's Lethality for the Elderly?*

65 Begley, *What Explains Covid-19's Lethality for the Elderly?*

66 Begley, *What Explains Covid-19's Lethality for the Elderly?*

Due to reduced immunity, when an older person contracts a virus it "is likely to stick around and cause complications."[67] "[G]enerally, people aged 65 and over are at risk of getting pneumonia, as well as people with medical conditions such as diabetes, cancer or a chronic disease affecting the lungs, heart, kidney or liver, smokers, . . . and infants aged 12 months and under."[68] "[T]here is evidence that pneumonia caused by COVID-19 may be particularly severe" because "cases of coronavirus pneumonia tend to affect all of the lungs, instead of just small parts."[69] "[T]he body's response is first to try and destroy [the virus] and limit its replication."[70] But the immune response "can be impaired in some groups, including people with underlying heart and lung conditions, diabetes and the elderly."[71] Indeed, "[a]ge is the major predictor of risk of death from pneumonia" and "[p]neumonia is always serious for an older person."[72]

Moreover, BOP's care for its rapidly aging population—a population that is at grave risk for complications from COVID-19—has been woefully inept.[73] According to OIG, BOP lacks appropriate staffing levels and infrastructure to address the needs of aging inmates.[74] Overcrowding prevents BOP from placing aging individuals in facilities that best address their medical needs.[75] Aging

---

67 *What Heart Patients Should Know about Coronoavirus*, Am. Heart Ass'n News (Mar. 24, 2020), https://www.heart.org/en/news/2020/02/27/what-heart-patients-should-know-about-coronavirus ("*What Heart Patients Should Know*, Am. Heart Ass'n News").

68 Graham Readfearn, *What Happens to People's Lungs When They Get Coronavirus?*, The Guardian (Apr. 1, 2020), https://www.theguardian.com/world/2020/apr/01/what-happens-to-peoples-lungs-when-they-get-coronavirus-acute-respiratory-covid-19 ("Readfearn, *What Happens to People's Lungs?*").

69 Readfearn, *What Happens to People's Lungs?*

70 Readfearn, *What Happens to People's Lungs?*

71 Readfearn, *What Happens to People's Lungs?*

72 Readfearn, *What Happens to People's Lungs?*

73 *See* CDC, *People at Higher Risk for Severe Illness.*

74 *See Aging Inmate Population*, at i-ii.

75 *See id.* at 25-26.

persons could wait years for routine medical equipment like eyeglasses or dentures.[76] These overcrowded and understaffed facilities cannot provide routine care on a good day, let alone during a global pandemic. This is especially true in Mr. Walker's case, as evidenced by the fact that his blood has been drawn just once. He has not received a special diet for his unexplained weight loss, and he is not expected to have his blood drawn again for 6 months, even though doctors just switched his ART medication in March.

**c. Mr. Walker's hypertension, hyperlipidemia, and diabetes also make him at higher risk of becoming seriously ill or dying should he contract COVID-19.**

In addition to his advanced age, and the fact that he is immunocompromised, Mr. Walker suffers from hypertension, hyperlipidemia, and diabetes.[77] According to a recent analysis by the CDC, "people with chronic conditions including diabetes, lung disease and heart disease appear to be at higher risk of severe illness from COVID-19."[78] The report revealed "78% of COVID-19 patients in the U.S. requiring admission to the intensive care unit had at least one underlying condition. And 94% of hospitalized patients who died had an underlying condition."[79] "Among COVID-19 patients admitted to the ICU, 32% had diabetes, 29% had heart disease and 21% had chronic lung disease, which includes asthma, COPD and emphysema. In addition, as mentioned above, 37% had other chronic conditions including hypertension or a history of cancer."[80]

---

[76] *See id.* at 17-19. One incarcerated individual requested dentures in 2010 and had still not received them when he was interviewed by OIG years later. He said "this makes it extremely hard to eat because he cannot chew food." *Id.* at 18. Another aging person had waited two years for an eye examination and was using a magnifying glass in the interim. *Id.* at 19.

[77] *See* PSR ¶ 86; *see also* generally Ex. 1.

[78] Allison Aubrey, *Who's Sickest from COVID-19? These Conditions Tied to Increased Risk*, NPR (Mar. 31, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/31/824846243/whos-sickest-from-covid-19-these-conditions-tied-to-increased-risk ("Aubrey, *Who's Sickest from COVID-19?*").

[79] Aubrey, *Who's Sickest From COVID-19?*

[80] Aubrey, *Who's Sickest From COVID-19?*

Diabetes is a huge concern for Mr. Walker. "Diabetes is a metabolic syndrome that involves blood glucose levels," weakening the immune system and making "it less effective." Due to a weakened immune system, people with diabetes "are at risk for many infections[,] not just coronavirus." For example, "[t]hey often struggle with infections on their skin and soft tissues, with pneumonia and even more serious conditions."

People with diabetes have a "higher risk of developing complications" from COVID-19 because "[h]igh levels of blood sugar over a long period of time can actually depress your immune system, so it doesn't respond as quickly to the virus." That buys the virus "more time to replicate, get down to [the] lungs, and cause . . . [breathing] problems . . . that can lead to needing hospital treatment." With COVID-19, "the lungs turn grey all over as the infection works from the outer air sacs of the lungs. Fluid, pus and debris build. And patients develop Acute Respiratory Distress Syndrome [ARDS]." "There is no cure for ARDS. Ventilators buy time as the body tries to heal but the lack of oxygen and the assault on the body put a tremendous strain on the heart. Many patients develop heart failure."

Diabetics also face a higher risk of developing pneumonia. "[T]here is evidence that pneumonia caused by COVID-19 may be particularly severe" because "cases of coronavirus pneumonia tend to affect all of the lungs, instead of just small parts." "[T]he body's response is first to try and destroy [the virus] and limit its replication." "But," the immune response "can be impaired in some groups, including people with underlying heart and lung conditions, diabetes and the elderly." "In fact, . . . the cause of most deaths from influenza [is] not the flu virus itself, but a secondary bacterial infection (often pneumonia)."

In sum, Mr. Walker is particularly susceptible to becoming seriously ill with COVID-19 while incarcerated. He is 62 years old and immunocompromised. He has hypertension, high cholesterol, and is a diabetic. All of these conditions – plus a global pandemic that proves deadly for people like

him – constitute an extraordinary and compelling reason warranting Mr. Walker's compassionate release.

## III. Releasing Mr. Walker is appropriate given Mr. Walker's history and characteristics and his rehabilitation while incarcerated.

Mr. Walker's sentence should be reduced because he is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g). *See* U.S.S.G. § 1B1.13(2). Furthermore, the relevant 18 U.S.C. § 3553(a) factors favor a sentence reduction. He is a non-violent offender. He would be able to get much needed medical care in the most effective manner in the community. Moreover, Mr. Walker has community support and a solid release plan.

### A. Mr. Walker is not a danger.

Along with the severe health issues referenced above, Mr. Walker is a non-violent offender, thus less likely to recidivate. Indeed, by reducing the potential spread of COVID-19 within the prison system, Mr. Walker's release would benefit public safety. *See, e.g., United States v. Harris*, No. 19-cr-356, 2020 WL 1482342, at *1 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions.").[81] Mr. Walker's release would also reduce the existing strain on BOP's healthcare facilities.[82] As is obvious from the deterioration of his health since moving into BOP custody, the

[81] *See also United States v. Davis*, No. 1:20-cr-9-ELH, 2020 WL 1529158, at *4 (D. Md. Mar. 30, 2020) ("If released, Davis will be removed from a custodial setting where the risk of infection is higher for everyone, including the healthy, and he will live in the community where he is able to practice social distancing, self-quarantine, self-isolate if infected, and seek medical treatment if necessary."); *United States v. Mclean*, No. 19-cr-380, Dkt. No. 21 (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception. That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v. Jaffee*, No. 19-cr-88, Minute Order (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement").

[82] *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, Office of the Inspector General (March 2016), available at https://oig.justice.gov/reports/2016/e1602.pdf (detailing BOP's medical staff shortages).

current tax on the prison healthcare needs by the pandemic are directly impacting the ability of BOP to respond to Mr. Walker's health needs.

Further, Mr. Walker has strong support in the community. This will be essential to his successful reintegration to society upon release. He has maintained close ties with his family, including his children's mother, Ms. Wesley, throughout his time in prison. Backed by this support, there is no reason to believe Mr. Walker would present a danger to society. He would also be leaving the Virginia area—the scene of where he committed the instant offense – to live in New Jersey.

While Mr. Walker has not yet served a very large portion of his sentence, this should not be a reason to deny his request. The percentage served has not been an impediment to others' release from the BOP, including at least two very high profile defendants. Notably, Mr. Manafort was released from a facility that had reported no confirmed cases of COVID-19 and despite having served less than a third of his seven-year sentence.[83] Similarly, Michael Cohen was released from the BOP to home confinement, despite having served less than half of his three-year sentence, and despite his sentencing judge having previously rejected his request for release, which was also opposed by the SDNY's United States Attorney's Office.[84] Local elected officials also received early release from the BOP, including Rob Villaneuva, Anthony Burfoot, and Shawn Brown.[85]

Courts around the country have also granted compassionate release motions, even though the defendants have not served a majority of their sentences. In *United States v. Body*, No. 18 CR 503, 2020

---

[83] *See* Rachel Weiner, Spencer S. Hus, and Matt Zapotosky, *Paul Manafort Released from Prison, Granted Home Confinement Due to Coronavirus Fears*, The Washington Post (May 13, 2020), https://www.washingtonpost.com/national-security/paul-manafort-granted-home-confinement-due-to-coronavirus-fears/2020/05/13/7746835c-8320-11ea-ae26-989cfce1c7c7_story.html.

[84] *See* Benjamin Weiser, Katie Benner and William K. Rashbaum, *Michael Cohen, Ex-Trump Lawyer, Leaves Prison Early Because of Virus*, The New York Times (May 20, 2020), https://www.nytimes.com/2020/05/20/nyregion/michael-cohen-coronavirus-prison-release.html.

[85] *See* Scott Daugherty, *Anthony Burfoot, Ron Villaneuva among thousands of inmates to be released amid coronavirus concerns*, The Virginian-Pilot (May 13, 2020), https://www.pilotonline.com/news/crime/vp-nw-burfoot-release-coronavirus-20200513-zjprbtlshnfb5axnuanugdy7xq-story.html.

WL 2745972 (N.D. Ill. May 27, 2020) the court granted compassionate release to defendant at FCI Terre Haute suffering from diabetes, high cholesterol, an inactive thyroid, and gout who served approximately ***4 months of 42-month sentence.*** For the judge, everything changed in the context of the pandemic:

> The Court can say, unequivocally, that the amount of time served to date by Body does not adequately account for the seriousness of his offense. He is essentially a lifelong, unrepentant drug dealer who has peddled dangerous substances that have no doubt caused significant harm to their users as well as ripple effects harming the communities where they (and he) have lived. If the seriousness of the crime were the sole question, the Court would have no hesitation in summarily denying Body's motion.

Similarly, in *United States v. Young*, No. CR19-5055, 2020 WL 2614745 (W.D. Wash. May 22, 2020), the court granted compassionate release to 64-year-old defendant at FCI Lompoc suffering from hypertension and chronic kidney disease who had served ***one year of five-year sentence.*** In *United States v. Delgado*, — F. Supp. 3d —, No. 3:18-cr-00017-VAB, 2020 WL 2464685 (D. Conn. Apr. 30, 2020), the judge granted compassionate release to a defendant at FCI Danbury suffering from obesity and sleep apnea after defendant served ***29 months of 120-month sentence.*** Just last week, a judge granted compassionate release to a defendant at the same facility as Mr. Walker, immunocompromised from cancer treatments, with ***9 of 15 years left on her sentence.*** *See United States v. Brown*, No. 13-176, 2020 WL 2615616 (E.D. Pa. May 22, 2020). *See also United States v. Brown*, Case No. 2:18-cr-360, Dkt. No. 35 (N.D. Ala. May 22, 2020) (young COVID-19 positive man with asthma released just ***1 year into 60-month sentence***).

There is no question that the amount of time Mr. Walker has served will be a concern for the Court. But, in light of his multiple, very serious health conditions and advanced age, releasing him from prison now prevents a near certain death sentence if he were to contract the virus.

A. The § 3553(a) factors weigh in favor of relief.

Mr. Walker's criminal conduct was serious. There is no question about that. Though he used no violence, he put poison into the streets of our community by selling drugs. Mr. Walker has regretted his decision to engage in this conduct since his arrest – not simply because he lost his freedom, but because he lost his marriage. He also lost control over his health (and his life) — something he realizes more than ever now. Mr. Walker is a different man today than the man who stood before this Court to be sentenced. He literally fears for his life every day since COVID-19 began infecting the BOP, knowing that should he contract the virus, he will very likely die. And with each passing day, as he sees his health deteriorate in very scary ways, with no way to socially distance, and with little control over his medical care, his concerns only deepens. While no one saw this coming at the time of his sentencing, no one intended that the sentence result in death.

Title 18 U.S.C. § 3553(2)(D) supports his release. It provides that "the court… shall consider the need for the sentence imposed to provide the defendant with much needed educational or vocational training, medical care, or other correctional treatment *in the most effective manner*." (emphasis added). In addition to receiving no programming during the lockdown, Mr. Walker is not currently receiving effective medical treatment. Prior to coming into BOP custody, Mr. Walker had not had lab work in over a year, i.e., since his incarceration on the instant offense.[86] Despite complaining of unexplained weight loss for months, Mr. Walker is currently not on a special diet to help get his weight up. And though doctors just changed his HIV treatment on March 16, 2020, Mr. Walker is not expected to have his blood taken for another 6 months, even though the CDC recommends "you should have a viral load test every … 2 to 8 weeks after starting or changing medicines."[87] There is

[86] *See* Ex. 1, at 26.

[87] *See* CDC, *What are the different tests that help monitor my HIV?*, available at https://www.cdc.gov/hiv/basics/livingwithhiv/understanding-care.html (last visited May 28, 2020)

no doubt Mr. Walker can get better medical treatment in the community, where he has some control over his own medical care.

B. Mr. Walker has a viable release plan.

Each day in custody is increasingly risky for Mr. Walker, who has no way to practice "social distancing" or other protectives measures that are mandated by health officials throughout the nation and which promise some hope of surviving the consequences of infection. Mr. Walker has formulated a release plan that will adequately address the concerns presented by COVID-19, protect the public, and ensure his successful transition into the community. Mr. Walker will live in Brick, New Jersey in a two bedroom townhouse with his child's mother Ms. Wesley. Mr. Walker and Ms. Wesley's 22 year old daughter currently lives there as well. However, that arrangement is not permanent. Ms. Wesley has lived in this townhouse for 8 years, and resided in New Jersey for 32 years. She is 62 years old and is currently healthy. Ms. Wesley works as a waitress at a local restaurant, where she has worked at for the past five years. Ms. Wesley has no criminal record aside from traffic matters, and will not tolerate any drug use, or drug sales, in her presence. She will be a positive influence on Mr. Walker. As far as medical care, prior to his incarceration, Mr. Walker had insurance, took his medications, and saw his doctors regularly. In the event that this health insurance coverage has lapsed, he will immediately apply upon his release. In short, Mr. Walker has a solid, and viable release plan.

## CONCLUSION

Mr. Walker respectfully requests that this Court order his immediate compassionate release and impose the following supervised release conditions: 1) that Mr. Walker abide by the standard supervised release conditions; 2) that within 72 hours of release, Mr. Walker contact the U.S. Probation Office by phone for specific reporting instructions; 3) that Mr. Walker reside on Greenwood Loop in Brick, New Jersey and be confined to the home—except when attending medical

appointments or other activities approved by the U.S. Probation Office – until his current release date of January 29, 2029.

In the alternative, the defense respectfully requests that the Court issue a non-binding recommendation that BOP transfer Mr. Walker to home confinement for the maximum period permissible, pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020), 18 U.S.C. § 3624(c)(2), the Second Chance Act of 2007, and 18 U.S.C. § 3621.[88]

Respectfully submitted,

ERNEST WALKER

By________________________

Amanda C. Conner, Esquire
VSB # 88317
Assistant Federal Public Defender
Attorney for Ernest Walker
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
(757) 457-0800
(757) 457-0880 (telefax)
amanda_conner@fd.org

[88] While BOP has sole authority to determine whether Mr. Walker is suitable for transfer to home confinement pursuant to Section 3624, this Court has the power to make a recommendation, and the BOP is required to consider a sentencing court's recommendation as to where a prisoner should serve his sentence. 18 U.S.C. § 3621(b)(4). Such a recommendation is not part of the sentence subject to appeal. *United States v. Smith*, 733 Fed. Appx 86, 88 (4th Cir. 2018), citing *United States v. Ceballos*, 671 F.3d 852, 856 (9th Cir. 2011) (citing other circuits finding the same). Accordingly, sentencing courts may make these "nonbinding recommendations to the Bureau of Prisons at any time." *Ceballos*, 671 F.3d at 856 n.2.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 28th day of May, 2020, I filed the foregoing with the Clerk of Court, and will send an electronic mail notification to the following:

Kevin M. Comstock
Assistant United States Attorney
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
757-441-6331
kevin.comstock@usdoj.gov

United States Probation Department
Duty Officer
600 Granby Street, Suite 200
Norfolk, VA 23510
757-222-7300
duty-vaep-norfolk@vaep.uscourts.gov

Amanda C. Conner
VSB # 88317
Assistant Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
(757) 457-0816
(757) 457-0880 (telefax)
amanda_conner@fd.org